# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39543**

_____

**UNITED STATES**
*Appellee*

**v.**

**Kahlil J. JONES**
Airman (E-2), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 11 June 2020

_____

*Military Judge:* Mark F. Rosenow.

*Approved sentence:* Dishonorable discharge, confinement for 4 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 5 May 2018 by GCM convened at Beale Air Force Base, California.

*For Appellant:* Lieutenant Colonel Anthony D. Ortiz, USAF; Major Benjamin H. DeYoung, USAF; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, LEWIS, and POSCH, *Appellate Military Judges*.

Chief Judge J. JOHNSON delivered the opinion of the court, in which Judge LEWIS and Judge POSCH joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

J. JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of willfully disobeying a superior commissioned officer and two specifications of sexual assault in violation of Articles 90 and 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 920.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the dishonorable discharge, confinement, and reduction; however, she disapproved the adjudged forfeitures and waived mandatory forfeitures for a period of six months for the benefit of Appellant's dependent child.

Appellant raises 16 issues on appeal: (1) whether the court-martial lacked subject matter jurisdiction over the sexual assault specifications; (2) whether the evidence was legally and factually sufficient to support the convictions; (3) whether the military judge erred by failing to disclose a basis for the military judge's disqualification; (4) whether the military judge erred in instructing the court members on the use of charged misconduct as evidence that Appellant did not reasonably believe the alleged victims consented to sexual acts and sexual contact pursuant to Mil. R. Evid. 404(b); (5) whether the military judge erred by limiting cross-examination of one of the victims; (6) whether the military judge erred by denying a defense motion to compel discovery of certain information and evidence regarding one of the victims; (7) whether the military judge erred by admitting certain out-of-court statements by the victims as prior consistent statements pursuant to Mil. R. Evid. 801(d)(1)(B); (8) whether the military judge provided improper findings instructions; (9) whether assistant trial counsel engaged in prosecutorial misconduct by interfering in the Defense's pretrial interview with one of the victims; (10) whether the military judge erred by allowing improper sentencing testimony from the victims' mothers; (11) whether the imposition of a mandatory dishonorable discharge for the offense of sexual assault in violation of Article 120, UCMJ, was unconstitutional; (12) whether the military judge erred by denying a defense motion to suppress Appellant's statements to a civilian police detective; (13) whether the military judge erred by denying a defense challenge for cause against a court

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The court-martial found Appellant not guilty of two specifications of abusive sexual contact in violation of Article 120, UCMJ, and one specification of unlawful entry in violation of Article 134, UCMJ, 10 U.S.C. § 934.

member; (14) whether the military judge erred in permitting the Government's expert witness to testify regarding "tonic immobility;" (15) whether Appellant received ineffective assistance of counsel; and (16) whether Appellant is entitled to relief for cumulative error.[3] In addition, although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable appellate delay. With respect to issues (11), (12), (13), (15), and (16), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief.[4] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

### A. CO

Appellant was stationed and lived on Beale Air Force Base (AFB), California, when he met CO through a dating application known as "OkCupid" in late 2015. CO was 16 years old at the time and lived with her mother and stepfather in a community approximately a one-hour drive from Beale AFB. She attended school online and used OkCupid to "find friends." CO misrepresented her age in order to use OkCupid.

After being matched by OkCupid, Appellant and CO communicated for approximately a month and a half to two months over multiple platforms, including text message, Internet, and live video calls. Appellant, who was 21 years old at the time, knew how old CO was because she told him and they talked about it. They shared an interest in video games, but talked about other topics

---

[3] Appellant personally raises issues (12), (13), (14), and (15) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1992). We have slightly reordered the issues Appellant presents in his brief.

[4] *See* R.C.M. 912(f)(4) (failure by challenging party to exercise peremptory challenge against any member waives appellate review of denial of challenge for cause); *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted) (appellant seeking to demonstrate ineffective assistance of counsel must establish both deficient performance and resulting prejudice); *United States v. Chatfield*, 67 M.J. 432, 439 (C.A.A.F. 2009) (citation omitted) (statements that are the product of an essentially free and unconstrained choice are not involuntary); *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999) (assertions of error without merit are not sufficient to invoke the doctrine of cumulative error); *United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *70–73 (A.F. Ct. Crim. App. 30 Sep. 2019) (unpub. op.), *rev. denied*, 2020 CAAF LEXIS 124 (C.A.A.F. 2020) (mandatory dishonorable discharge for sexual assault conviction does not violate Fifth or Eighth Amendments).

as well. According to CO's later testimony, Appellant sometimes made comments of a sexual nature to her, but she "brushed them off" because she "wasn't really interested in talking about that kind of stuff."

Appellant and CO made plans for Appellant to visit her at her apartment on 29 January 2016 and to spend the night. Appellant was to sleep in CO's room while CO slept with her mother in her mother's bedroom. This would be the first time Appellant and CO met in person.

Appellant arrived on the evening of 29 January 2016 as planned. CO's mother and stepfather were also home; CO had misled her mother regarding Appellant's age. Initially, Appellant and CO played with the family dog and ate pizza before moving to CO's room to watch television. While they were watching television, Appellant began pulling on CO's pants, trying to touch her breasts, and kissing her. However, CO was not interested in sexual activity, and after a while Appellant gave up and went to sleep. CO departed the room and slept in her mother's bed, as planned.

When CO awoke in the morning, she sent Appellant a text message for him to let her know when he was awake. When Appellant responded, CO went into her room and sat on the bed, where Appellant was lying under the blankets. Appellant and CO each used their phones for a while before Appellant stood up, moved in front of CO, and pushed her back on the bed. Initially CO thought Appellant intended to lie down next to her, but instead he pulled her pants and underwear down. CO tried to pull them up. After some struggle, Appellant pushed CO's legs open and penetrated her vagina with his penis. CO testified she asked him to stop, "first politely, then forcefully." Appellant "acknowledged that [she] was speaking by saying, 'It's okay,' repeatedly throughout the entire thing." CO tried pushing on Appellant's hips and stomach, but she was "not strong enough." CO then gave up because she "knew that [she] couldn't struggle anymore." Eventually, Appellant removed his penis and ejaculated on CO's stomach. According to CO, Appellant then played video games in her room for a "few hours" while she remained in the room. Then Appellant received a call on his phone, told CO he had to return to the base, and departed.

CO testified that for the next two days it did not "register" that she had been sexually assaulted, and she "just thought that [she] messed up." During that time CO sent Appellant messages asking him when he was going to return. She explained at trial that she reasoned at the time, "we are friends and I am desperate for friends, so I should message him." Appellant never returned.

Two days after the assault, CO told her life coach, TB, about what had happened, and he "helped" CO tell her mother. CO's mother contacted the civilian police. The police encouraged CO to confront Appellant about the sexual as-

sault through text messages. In a series of exchanged messages, Appellant expressed the belief that he would get in trouble if they continued a relationship. Appellant asked CO if she "even like[d]" the sex, which led to the following exchange:

> CO: I didn't really have a choice now did I?
>
> CO: just wish it could have been on my terms. maybe next time you will consider that.
>
> Appellant: I'm sorry
>
> Appellant: [two crying emojis]
>
> CO: genuinely?
>
> Appellant: Very. I overstepped your boundaries
>
> Appellant: And it may have ruined our relationship
>
> CO: you still haven't answered my question, why did you keep going when I asked you to stop and told you that you were hurting me?
>
> Appellant: Why do you think someone would keep going in that situation
>
> CO: Um I don't know, that's why I'm asking you!
>
> Appellant: That person would probably think that it felt too good and really couldn't control themself
>
> . . .
>
> Appellant: It felt too good [CO]
>
> Appellant: That's why
>
> Appellant: Happy?

Appellant then asked CO to delete the texts and to "drop this."

CO underwent a forensic sexual assault nurse examination on 2 February 2016 which identified a bruise on CO's breast and a possible minor genital injury, which the nurse examiner opined was consistent with CO's description of the incident but indeterminate with respect to whether a sexual assault had occurred. Forensic analysis by the United States Army Criminal Investigation Laboratory (USACIL) identified Appellant's DNA on CO's bedsheet and cervical swab, as well as semen with Appellant's DNA profile on the pants CO was wearing the morning of the assault.

On 9 February 2016, Detective (Det) AC, a civilian police detective, called Appellant to ask if he would agree to meet to talk about CO. Appellant agreed

and met Det AC the following day for a recorded interview at the police department. When Det AC asked Appellant to explain what happened, Appellant described going to CO's apartment, spending the night, deciding the next morning that he did not want to be in a relationship with CO, and texting a friend to call him as a pretext to leave the apartment. Appellant denied any sexual intercourse or physical contact with CO. Det AC accused Appellant of lying. He falsely told Appellant that the police already had evidence of Appellant's DNA on CO's body and bedding, and that a physical examination of CO revealed trauma indicative of forcible rape. Faced with these claims, Appellant repeatedly modified his version of events, first admitting to "kissing and cuddling" on the night of 29 January 2016, and later admitting to consensual sexual intercourse the following morning.

## B. KE

KE was a female Airman stationed at Beale AFB when she met Appellant through Tinder, a phone application for dating, in late May or early June 2017. Within a couple of days, KE met Appellant in person and they initiated a sexual relationship. On approximately three to five occasions, KE and Appellant met, talked, ate food together, and engaged in sexual intercourse.

On 14 or 15 June 2017, KE invited Appellant to her dormitory room again. However, KE was "exhausted" and told Appellant she just wanted to "cuddle" and not to have sex. Appellant arrived shortly afterward. KE greeted him, hugged him, and reminded him she did not want to have sex. Appellant agreed. KE and Appellant then got in KE's bed, with Appellant behind her in a "spooning" position with his arm around her stomach. KE was wearing sweatpants, underwear, a t-shirt, and a bra. Appellant was wearing a t-shirt and shorts. KE and Appellant talked for a period of time, and then KE began to fall asleep.

At trial, KE described what happened next:

> I remember I was either almost fully asleep or just got into full sleep when I felt my pants and underwear pulled down at the same time. Um -- I was shocked. And then right as I felt him insert his penis in, my eyes shot wide open. I didn't realize fully what was happening. I mumbled "stop" after a couple of thrusts. He didn't hear me so he said, "Huh?" And then I said "stop" a little bit louder. And then he pulled out and pulled my pants up.

KE testified she was "shocked," "paralyzed," and "didn't know what to do" when Appellant pulled down her pants. She "didn't expect it" because she "trusted [Appellant] a little bit" and "felt safe" with him. On cross-examination, she clarified that she had been asleep and was awakened when Appellant pulled her clothing down.

Appellant then asked KE if she wanted him to leave. KE replied that she "didn't care." KE fell back asleep. KE testified that when she awoke, she believed Appellant had already left. Within a day or two, KE sent Appellant a screenshot of Article 120, UCMJ, from the *Manual for Courts-Martial, United States*. Appellant responded that he wanted to talk to KE in person. KE met with Appellant in her room, where she asked him why this had happened. Appellant responded that he did not know, and that he had been "out of it." When KE told Appellant she felt the need to report it, Appellant asked her not to because he was "young" and had his "life to live."

Over the next several days Appellant continued to ask KE not to report the incident. KE contacted her mother seeking advice. KE's mother put her in contact with a family friend who happened to be a senior noncommissioned officer in the Air Force. Through the family friend, KE was put in contact with the Sexual Assault Response Coordinator (SARC) at Beale AFB. KE made a restricted sexual assault report to the SARC on 21 June 2017. In September 2017, KE changed her report from restricted to unrestricted after she learned of other allegations of sexual misconduct by Appellant.

Special Agent JW of the Air Force Office of Special Investigations (AFOSI) interviewed Appellant regarding KE's report. After a rights advisement and waiver, Appellant initially stated he had consensual sex with KE only once.[5] With regard to the alleged sexual assault, Appellant acknowledged there had been a subsequent night where "things got weird." Appellant described "cuddling" in KE's room because "honestly, yeah, she was saying, like, she really wasn't like interested in hooking up . . . ." However, according to Appellant, KE then took her shirt off and put Appellant's hand on her chest, which made him think she may have changed her mind. Appellant then "kiss[ed] her on her neck or something and like, I think I tried to like slide her pants down and she was like, I still don't want to f*ck . . . ." Later in the interview, Appellant clarified that he did "actually . . . pull her pants down." However, he repeatedly denied penetrating KE with his penis and told Special Agent JW he simply went to sleep after KE pulled her pants back up.

**C. Disobeying a Lawful Order**

On 13 and 14 September 2017, Lieutenant Colonel (Lt Col) MD, Appellant's squadron commander, issued Appellant oral and written orders that Appellant was "prohibited from entering another female's dorm room or having a female

---

[5] When Special Agent JW challenged Appellant with KE's statement that they had consensual sex on multiple occasions, Appellant stated he only remembered one time, but he was not sure and it was possible there were other occasions.

enter [his] dorm room." Appellant signed a written acknowledgment of the order on 15 September 2017.

A1C EO met Appellant at a party on 9 October 2017. After the party, A1C EO communicated with Appellant by Snapchat and invited him to visit her dormitory room on Beale AFB. In the early morning hours of 11 October 2017 Appellant arrived at A1C EO's room, where they watched movies for approximately an hour before she asked him to leave.

## II. DISCUSSION

### A. Jurisdiction

We review questions of jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). Challenges of jurisdiction not raised at trial are not waived and may be raised for the first time on appeal. *See* Rule for Courts-Martial (R.C.M.) 907(b)(1); *United States v. Reid*, 46 M.J. 236, 240 (C.A.A.F. 1997).

The court-martial convicted Appellant of Specifications 2 and 3 of Charge I, which alleged that Appellant committed sexual assault on CO and KE, respectively, by causing bodily harm. As charged, in order to convict Appellant of these offenses the court members were required to find beyond a reasonable doubt: (1) that Appellant committed a sexual act upon the victim by causing penetration, however slight, of the vulva, and (2) that Appellant did so by causing bodily harm to her, specifically, the penetration of the vulva by the penis without consent. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *See MCM*, pt. IV, ¶ 45.a.(g)(3).

On appeal, Appellant contends the court-martial lacked jurisdiction over Specifications 2 and 3 because he was convicted on a theory of sexual assault other than sexual assault by bodily harm. He notes that in accordance with R.C.M. 201(b)(3), a court-martial has jurisdiction only over charges that are referred to it by a competent authority. Appellant argues that the court members were presented with two theories of sexual assault that were not referred for trial, specifically that he sexually assaulted CO and KE by placing them in fear, and that he sexually assaulted KE by penetrating her when she was asleep. *See MCM*, pt. IV, ¶ 45.a.(b)(1)(A), (b)(2). Appellant points to testimony from CO and KE describing their feelings during the assaults, and to KE's testimony that she was asleep when she felt Appellant pull down her pants. He further contends that the senior trial counsel "presented" these alternative theories during the Government's closing argument, and that the military judge

8

failed to adequately instruct the members to prevent confusion about the different theories. Therefore, Appellant concludes he may have been unlawfully convicted based on theories of guilt that were never referred to trial.

We recently considered a similar argument in *United States v. Plourde*, No. ACM 39478, 2019 CCA LEXIS 488 (A.F. Ct. Crim. App. 6 Dec. 2019) (unpub. op.), *rev. denied*, 2020 CAAF LEXIS 106 (C.A.A.F. 2020). There, as in this case, the appellant was charged with sexual assault by causing bodily harm; in *Plourde*, the appellant contended on appeal he was improperly convicted on an uncharged theory of constructive force, over which the court-martial lacked jurisdiction. *Id*. at *12–16. In *Plourde*, we found the jurisdictional argument to be without merit; we reach the same conclusion in Appellant's case. *Id*. at *16.

As in *Plourde*, Appellant misconstrues the relevant inquiry with respect to jurisdiction. A general court-martial has jurisdiction to try persons subject to the UCMJ for any offense punishable under the UCMJ. Article 18, UCMJ, 10 U.S.C. § 818; *see United States v. Ali*, 71 M.J. 256, 261–62 (C.A.A.F. 2012). The specifications of sexual assault by bodily harm in violation of Article 120, UCMJ, referred for trial by Appellant's court-martial are unquestionably offenses punishable under the UCMJ. Similarly, Appellant was on continuous active duty in the Air Force throughout the time frames of the charged offenses, and has offered no challenge at trial or on appeal to the court-martial's jurisdiction over his person. Thus the court-martial had jurisdiction over Appellant and over Specifications 2 and 3 of Charge I.

## B. Legal and Factual Sufficiency

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we

take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

**2. Analysis**

Appellant asserts his convictions for sexual assault against CO and KE are both legally and factually insufficient. We consider each in turn.[6]

### a. CO

The Government introduced strong evidence to support Appellant's conviction for sexual assault against CO. CO testified that she never consented to sexual intercourse with Appellant. The night before the assault, Appellant kissed CO and tried to touch her breasts and pull on her pants when they were alone in her room, but she did not want to have sex and Appellant eventually gave up. In the morning, CO entered the room and sat on the bed. Without any sexual conversation or foreplay, Appellant pushed CO down on the bed, which confused her at first. When he pulled down her pants and underwear, she struggled to pull them back up. CO testified she asked Appellant to stop and struggled against him, but he disregarded her protests and she eventually gave up because she was not strong enough.

Other evidence reinforced CO's testimony. Forensic analysis identified Appellant's DNA on CO's bedsheet and cervical swab, and Appellant's semen in her pants. Appellant's pretext text exchange with CO after the assault was incriminating in several respects: he apologized and acknowledged he "overstepped her boundaries;" he did not dispute her assertion that she asked him to stop and told him he was hurting her; he stated that he disregarded her protests because "it felt too good;" and he repeatedly asked her to delete the text messages. Furthermore, Appellant lied repeatedly during his interview with Det AC to the effect that he did not touch CO and, more specifically, did not have sexual intercourse with her, before he eventually stated they had consensual sexual intercourse.

Appellant contends CO consented when Appellant penetrated her, and suggests that her subsequent account is colored by her immaturity, disappointment, and anger at how Appellant behaved after they had sex. He suggests

---

[6] On appeal, Appellant does not challenge the legal and factual sufficiency of his conviction for disobeying a superior commissioned officer in violation of Article 90, UCMJ.

CO's life coach TB influenced her after-the-fact perception of the incident as Appellant "raping" her due to California's statutory rape criminal statute.[7] He further suggests CO's family received certain financial assistance due to CO's status as an alleged sexual assault victim. Additionally, Appellant argues that because the Government charged him with "penetrating [CO's] vulva with his penis without her consent," it was required to prove the absence of consent at the moment of penetration. If CO initially consented to sexual intercourse but subsequently withdrew her consent after penetration, he argues, Appellant could not be found guilty of the offense as charged.

Although this court has not previously had occasion to decide the issue, we doubt Appellant's assertion that a person cannot effectively withdraw consent to sexual intercourse after penetration has occurred. *See United States v. Rouse*, 78 M.J. 793, 786 (A. Ct. Crim. App. 2019), *pet. denied*, 79 M.J. 254 (C.A.A.F. 2019) ("A majority of the jurisdictions we have surveyed agree that consent to a sexual act may be withdrawn at any time, including after the sexual act has begun.") However, we need not decide the issue now, because the evidence demonstrates CO did not consent to the initial penetration either, and Appellant knew or should reasonably have known she did not consent. We are not persuaded that any of Appellant's arguments materially diminish CO's testimony that he disregarded her protests and efforts to keep her clothes on. CO's testimony was well supported by Appellant's text message admissions and demonstrations of consciousness of guilt.

### b. KE

Similarly, the Government introduced ample evidence to support Appellant's conviction for sexual assault against KE. KE testified that she repeatedly told Appellant she did not want to engage in sexual intercourse on the night of the assault. She also clearly testified that he penetrated her vagina with his penis. Notably, at Appellant's AFOSI interview he told Special Agent JW that KE did tell him at least twice that she did not want to have sex. In

---

[7] Appellant notes that under California law, due to their respective ages, it was a crime for Appellant to engage in sexual intercourse regardless of whether CO consented. At trial, the military judge instructed the court members that he took judicial notice that under the California Penal Code, "[s]exual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is under the age of 18 years old and the perpetrator is at least 18 years old, constitutes the crime of unlawful sexual intercourse." *See Unlawful sexual intercourse with a minor*, Cal. Penal Code § 261.5(a). However, under the UCMJ, a member may lawfully engage in sexual intercourse with a consenting 16-year-old. *See generally* 10 U.S.C. §§ 920, 920b.

fact, Appellant's version of the incident largely matches KE's testimony, to include pulling down her pants, except for his self-serving claim that she put his hand on her chest and his denial that he penetrated her.

We also note the absence of a credible motive for KE to falsely allege sexual assault against Appellant. KE testified that the two had a consensual sexual relationship; it was Appellant who attempted to minimize the extent of their prior consensual encounters during his AFOSI interview. KE challenged Appellant the day after the assault by texting him a screenshot of Article 120 of the UCMJ. She also informed her mother and a family friend shortly after the incident. Although, at Appellant's urging, KE initially declined to report the assault, she eventually made a restricted report at a time when she was unaware of any other allegations against Appellant. It was only after she learned of another allegation that she changed her report to unrestricted.

On cross-examination before the members, KE did admit she had lied under oath in an earlier hearing in Appellant's case when she denied having had a sexual relationship with another individual. On redirect examination, KE stated she did so because she believed acknowledging the sexual relationship "would have made [her] look like [she] was a whore." Certainly, having lied under oath in order to protect her reputation does not enhance KE's credibility. Nevertheless, despite this admission, the court members who saw and heard KE testify found her account of the sexual assault credible. So do we. In contrast to her relationship with the other individual, KE was forthright about her consensual sexual relationship with Appellant. As described above, Appellant's own account of the incident matches KE's account in many respects, and we find it difficult to discern a credible motive for KE to have falsified her allegation.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's convictions for sexual assault beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the court members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction of Specifications 2 and 3 of Charge I is therefore legally and factually sufficient.

## C. Military Judge Disqualification

### 1. Additional Background

As reflected in his official Air Force biography, the military judge served as a senior trial counsel for the four years preceding his assignment as a military judge. For the two years immediately preceding his assignment as a military

judge, he also served as Chief of Policy and Coordination of the Special Victims Unit (SVU) within the Air Force Legal Operations Agency (AFLOA).

Appellant was arraigned on 17 January 2018. On the record prior to Appellant's arraignment, the military judge stated that he was not aware of any grounds for challenge against him; that he did not have any concerns about his impartiality, fairness, or ability to serve as the military judge in Appellant's trial; and that he did not believe a member of the public could reasonably challenge his impartiality and fairness. He did note that he had served as the detailed military judge in "a prior proceeding" involving Appellant, of which the parties were aware.[8] When the military judge asked whether either party desired to question or challenge him, counsel for both sides declined.

After motions hearings on 22–23 January 2018, Appellant's court-martial reconvened on 23 April 2018. At the outset of that session, after re-advising Appellant of his rights to counsel, the military judge extensively described an R.C.M. 802 conference he conducted with the parties on the morning of 23 April 2018 before the court convened. At the conference, the military judge had disclosed that he was aware that a comment he had made during his time as a senior trial counsel with regard to an unrelated case had become the subject of an appeal at this court.[9] Neither party expressed a desire to question or challenge him with regard to that matter during the R.C.M. 802 conference. The military judge then reiterated that he was not aware of any matter that might be a ground for challenge against him. He again asked whether either party desired to question or challenge him, and counsel for both parties again declined. At no point during Appellant's trial did the Defense challenge the military judge or request that he recuse himself.

### 2. Law

We review a military judge's decision not to recuse himself for an abuse of discretion. *See United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge abuses his discretion when: (1) the findings of fact upon which

---

[8] Originally, only a single charge and specification alleging Appellant committed sexual assault against CO were referred for trial. After some motions hearings, that charge and specification were withdrawn and dismissed without prejudice, terminating that proceeding.

[9] The military judge also related that he had no direct involvement in any actions or decisions by members of the Government Trial and Appellate Counsel Division—the parent organization for Air Force senior trial counsel—described in this court's opinions in *United States v. Vargas*, No. ACM 38991, 2018 CCA LEXIS 137 (A.F. Ct. Crim. App. 15 Mar. 2018) (unpub. op.), *rev. denied*, 78 M.J. 51 (C.A.A.F. 2018), and *United States v. Bowser*, 73 M.J. 889 (A.F. Ct. Crim. App. 2014), *aff'd*, 74 M.J. 326 (C.A.A.F. 2015).

he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself." In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). A military judge "should not leave [a] case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1) Discussion). "Of course, '[a] . . . judge has as much obligation not to . . . [disqualify] himself when there is no reason to do so as he does to . . . [disqualify] himself when the converse is true.'" *United States v. Kincheloe*, 14 M.J. 40, 50 n.14 (C.M.A. 1982) (alterations in original) (citations omitted).

### 3. Analysis

On appeal, Appellant faults the military judge for failing to disclose his prior assignment as Chief of Policy and Coordination for the AFLOA SVU. Appellant contends that in that role, the military judge had provided "significant" support for the Government and for alleged victims of sexual assault. He helped develop strategies for the investigation of allegations of sexual assault and child sexual abuse, and testified twice on behalf of the Air Force before the congressional Joint Proceedings Panel (JPP) regarding Article 120, UCMJ. Appellant further contends the military judge made several "questionable" rulings during his trial in favor of the Government and one of the alleged victims, CO, in particular. Appellant concludes that at a minimum, a member of the

public with full knowledge of the military judge's assignment history, testimony before the JPP, and rulings during Appellant's trial could reasonably question his impartiality and fairness. Appellant contends the military judge was required to disclose this prior role, and had he done so, the Defense would have moved to recuse the military judge. We disagree.

First, we are not persuaded the Defense was unaware of the military judge's prior role as Chief of Policy and Coordination for the AFLOA SVU. Both of Appellant's trial defense counsel were active duty Air Force judge advocates, and the military judge's official biography would have been readily available to them. Notably, Appellant neither offers nor points to any indication his counsel were unaware of the military judge's assignment history, or that they would have moved for recusal had the military judge specifically addressed his prior position on the record.

Second, the military judge did specifically address several other potential bases for concern regarding his impartiality. Moreover, he provided the parties ample opportunity to question or challenge him regarding these or any other matters. We believe a member of the public would have taken note of the military judge's effort to thoroughly identify and vet any such concerns, and of the parties' apparent satisfaction with his fairness and impartiality.

Third, as we discuss below, we find the military judge did not abuse his discretion with respect to the rulings Appellant now challenges on appeal. We are not persuaded his rulings suggest any inappropriate bias in favor of the Government or the alleged victims, or against Appellant.

Fourth, we have considered the military judge's experience as a senior trial counsel, as well as his comments to the JPP to which Appellant refers us. We further note the military judge had also served as a defense counsel for two years. We perceive no basis to conclude he brought any inappropriate bias in favor of the Government or alleged victims of sexual assault to his role as a military judge, or that a fully-informed member of the public might question his impartiality. The military judge's record implies he diligently and appropriately performed the roles to which he was assigned.

For the foregoing reasons, we find the military judge did not abuse his discretion by failing either to specifically identify his prior role as Chief of Policy and Coordination for the SVU, or to recuse himself *sua sponte*.

## D. Mil. R. Evid. 404(b)

### 1. Additional Background

Appellant was charged with a total of four specifications of violating Article 120, UCMJ. Specifications 2 and 3 of Charge I alleged sexual assault by caus-

ing bodily harm against CO and KE, respectively; Specifications 1 and 4 alleged Appellant committed abusive sexual contact against two other victims, AC and KF, in unrelated incidents by touching AC's vagina and breast and kissing her mouth and touching KF's breast and buttocks and kissing her neck, without their consent. Both AC and KF testified at trial and described the alleged abusive sexual contact. The court members found Appellant not guilty of Specifications 1 and 4 of Charge I.

Before trial, the Government provided notice to the Defense of its intent to use "[t]he Article 120 offenses and their facts and circumstances, to prove intent, motive and lack of mistake for the other Article 120 offenses," pursuant to Mil. R. Evid. 404(b). In response, the Defense submitted a motion in limine to request the military judge to prevent "the Government from arguing the charged offenses bolster each other" as improper character and propensity evidence. The Government responded that the evidence of each charged Article 120, UCMJ, offense was proper evidence of Appellant's motive, intent, and absence of a mistake of fact as to the alleged victims' consent. The military judge received argument on the motion and issued a written ruling denying the defense request for a preliminary order "preclud[ing] as a matter of law any possibility of the use of evidence admissible to prove one charged offense for purposes contemplated within [Mil. R. Evid.] 404(b)(2)." However, the military judge stated he would consider any timely requests for reconsideration as the case developed.

The military judge readdressed Mil. R. Evid. 404(b) when he discussed his proposed findings instructions with counsel. He noted the Defense had previously objected to the Government's intended use of Mil. R. Evid. 404(b) evidence, and stated his belief that the issue was preserved for review on appeal. Relying in part on this court's decision in *United States v. Lightsey*, No. ACM 38851 (rem), 2018 CCA LEXIS 220, at *6 n.2 (A.F. Ct. Crim. App. 30 Apr. 2018) (unpub. op.), the military judge then concluded that Mil. R. Evid. 404(b) permitted evidence of one charged Article 120, UCMJ, offense to be used as evidence of another charged Article 120, UCMJ, offense, if the evidence was relevant to the other offense for a purpose other than character or propensity to engage in criminal conduct.

The military judge instructed the members, *inter alia*, as follows: (1) the burden was on the Prosecution to prove each and every element of each offense beyond a reasonable doubt; (2) proof of one offense carries with it no inference that Appellant was guilty of any other offense; (3) there was "some evidence" presented on Charge I and its specifications which also may be considered for a limited purpose "among the separate sexual offenses;" (4) evidence supporting each allegation in Charge I and its specifications may be considered for its tendency, if any, to rebut a defense based on an incorrect belief that Appellant

16

might have held that any alleged victim consented to the alleged sexual conduct; (5) such evidence could be considered only for whether Appellant had a reasonable mistake of fact as to consent; and (6) the evidence may not be considered for any other purpose, including whether Appellant had general criminal tendencies and was therefore more likely to have committed the charged offenses.

**2. Law**

We review a military judge's ruling pursuant to Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted).

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving intent or absence of mistake. Mil. R. Evid. 404(b)(2). We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that [the] appellant committed prior crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (alterations in original) (quoting *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989)).

**3. Analysis**

Appellant contends the military judge abused his discretion by permitting the Government to use, and instructing the court members that they could consider, evidence of each of the charged violations of Article 120, UCMJ, as evidence of the other charged violations of Article 120. Appellant relies substantially on the reasoning of the United States Court of Appeals for the Armed Forces (CAAF) in *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016).

In *Hills*, the CAAF narrowed the scope of Mil. R. Evid. 413, which generally provides: "In a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. Such evidence may be considered on any matter to which it is relevant," including to prove the accused has a propensity to commit sexual assault. Mil. R. Evid.

413(a); *see United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006). Mil. R. Evid. 413 thus provides an exception to the general prohibition in Mil. R. Evid. 404(b)(1) on using evidence of other crimes or wrongful acts to demonstrate propensity. *Hyppolite*, 79 M.J. at 165 n.4. However, in *Hills* the CAAF held that evidence of the accused's commission of a sexual assault may not be used in this way if that alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to it. 75 M.J. at 356; *see also United States v. Guardado*, 77 M.J. 90 (C.A.A.F. 2017); *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017).

Citing *Hills*, Appellant contends that Mil. R. Evid. 404(b)(2), like Mil. R. Evid. 413, is a rule of *admissibility* and not a rule of *use*. He notes Mil. R. Evid. 404(b)(2) provides that evidence of other crimes, wrongs, or acts "may be admissible for another purpose" besides character and propensity. Because evidence of charged misconduct is already relevant and admissible, he reasons the structure of Mil. R. Evid. 404(b)(2) suggests it was not intended to apply to evidence of charged offenses. *See Hills*, 75 M.J. at 355 ("Charged misconduct is already admissible at trial under [Mil. R. Evid.] 401 and 402, and it is not subject to exclusion under [Mil. R. Evid.] 404(b)."). Therefore, he contends applying Mil. R. Evid. 404(b)(2) to evidence of charged misconduct is an abuse of discretion per se. Appellant further argues that applying Mil. R. Evid. 404(b)(2) to charged misconduct implicates some of the same fundamental concerns the CAAF identified in *Hills*, such as finding the accused committed one charged offense by a preponderance of the evidence to then prove he committed a different charged offense beyond a reasonable doubt—a proposition he finds "antithetical to the presumption of innocence." *See Hills*, 75 M.J. at 357.

However, Appellant's position is undermined by the CAAF's subsequent decision in *Hyppolite*. There, the CAAF held the trial judges did not abuse their discretion in permitting the Government under Mil. R. Evid. 404(b) to use evidence the accused committed three charged Article 120, UCMJ, offenses as evidence he had a common plan and intent to commit two other charged Article 120 offenses. *Hyppolite*, 79 M.J. at 167. The CAAF held that the familiar three-part test for Mil. R. Evid. 404(b)(2) evidence articulated in *Reynolds* provided the correct framework for analysis. *Id.* at 164 (citing *Reynolds*, 29 M.J. at 109). The majority opinion in *Hyppolite* referred to *Hills* and *Hukill* only in passing in a footnote, finding them inapposite because the trial judges in *Hyppolite* did not rely on Mil. R. Evid. 413 and "refused to consider the evidence admitted for the purpose of showing propensity." *Id.* at 165 n.4.

Reading *Hills* and *Hyppolite* together, then, we can see where the CAAF has drawn the essential distinction in the law, notwithstanding Appellant's arguments and concerns. Proof of an accused's guilt of one offense may not be used as evidence of a character or propensity to commit such offenses, in order

18

to prove his guilt of another charged offense. In other words, the Government may not argue that if the factfinder believes the accused committed one charged offense, they can infer from his guilt alone that he is also more likely to be guilty of another charged offense. However, the Government *may* use evidence the accused committed one charged offense as evidence with respect to another charged offense if it is relevant to prove a material fact other than character or propensity—provided that the notice requirements of Mil. R. Evid. 404(b)(2) and the *Reynolds* test are satisfied.

Accordingly, the next step in our analysis is to consider the application of the three-part test for Mil. R. Evid. 404(b)(2) evidence from *Reynolds*, 29 M.J. at 109, to the evidence in Appellant's case. Having denied the Defense's *Hills*-oriented objection, the military judge did not formally address his analysis of the *Reynolds* criteria before providing the Mil. R. Evid. 404(a) instructions described above. We note the third prong of the *Reynolds* test incorporates the balancing test of Mil. R. Evid. 403, *see Reynolds*, 29 M.J. at 109; accordingly, we afford less deference to the military judge's ruling on this point. *See United States v. Barnett*, 63 M.J. 388, 394–96 (C.A.A.F. 2006) (trial judge ruling on admission of Mil. R. Evid. 404(b) evidence afforded less deference on appeal where balancing inquiry is not conducted on the record).

Nevertheless, we conclude the military judge did not abuse his discretion under *Reynolds*. First, the testimony of the several alleged victims and other evidence adduced by the Government would support a finding by the court members that Appellant committed the alleged acts. Second, this evidence was relevant to the non-propensity purposes identified by the military judge—evidence of Appellant's pattern of disregarding manifestations of non-consent in multiple situations has some tendency to demonstrate he did not reasonably believe subsequent alleged victims consented to his actions. Third, the military judge did not abuse his discretion in concluding that, with proper instructions, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. The military judge provided clear and appropriate instructions that each element of each offense required proof beyond reasonable doubt, that the members were not allowed to infer guilt of an offense based on proof of guilt of another offense, and that the Mil. R. Evid. 404(b) instruction did not permit a finding that Appellant had a "bad character" or general criminal tendencies. Court members are presumed to follow the military judge's instructions absent evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted). In this case, the members' mixed findings on the charged Article 120, UCMJ, offenses, although hardly conclusive, provide some indication that they appreciated the requirement that each charged offense stand on its own. *But see Guardado*, 77 M.J. at 94 ("It simply does not follow that because an individual was acquitted of a specification that evidence of that specification was not used as improper propensity evidence

and therefore had no effect on the verdict."). Moreover, we note senior trial counsel's argument made proper use of the military judge's instruction and did not invite the members to misuse the evidence to find propensity.

Accordingly, we find the military judge did not abuse his discretion by permitting the Government to use, and instructing the court members that they could consider, evidence of each of the charged violations of Article 120, UCMJ, with regard to the absence of Appellant's reasonable mistake of fact as to consent.

## E. Cross-Examination of CO

### 1. Additional Background

On cross-examination, senior defense counsel asked CO whether she scratched or punched Appellant during the assault, or thought about "hurting him." CO responded that she was "not a violent person by nature." On further questioning, CO acknowledged she had at least two "very violent outbursts in the past." Senior defense counsel then asked CO whether she had "injured people," at which point the Government objected and the military judge sustained the objection on cumulativeness under Mil. R. Evid. 403. When senior defense counsel continued to ask about CO's violent outbursts, senior trial counsel requested a hearing without the court members pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a).

After hearing argument from counsel, the military judge agreed to allow the Defense to clarify whether, when CO acted violently in the past, it had been in response to feeling threatened, and to clarify that CO had previously testified that she had reacted violently less than ten times in her life. However, the military judge did not permit the Defense to question CO about any injuries she may have caused. He explained the question about injuries was "truly a distraction" and not "necessary," and it did not survive the balancing test comparing probative value with countervailing concerns under Mil. R. Evid. 403.

When CO's testimony resumed before the court members, she confirmed she had previously testified she had fewer than ten violent outbursts, and that some of those outbursts were in response to feeling threatened.

### 2. Law

"We review a military judge's decision to exclude or admit impeachment evidence for abuse of discretion." *United States v. Langhorne*, 77 M.J. 547, 555 (A.F. Ct. Crim. App. 2017) (citing *United States v. Bins*, 43 M.J. 79, 83 (C.A.A.F. 1995)).

Mil. R. Evid. 404(b)(1) provides that "[e]vidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Evidence that is relevant, material, and otherwise admissible may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

"An accused has a constitutional right 'to be confronted by the witnesses against him.'" *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (quoting U.S. CONST. amend. VI). "That right necessarily includes the right to cross-examine those witnesses." *Id.* (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974)) (additional citation omitted). However, an accused is not simply allowed "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." *United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011) (quoting *Van Arsdall*, 475 U.S. 673, 679 (1986)) (additional citations omitted).

### 3. Analysis

Appellant contends the military judge erred by preventing trial defense counsel from cross-examining CO as to whether she had ever injured anyone. He contends CO's testimony that she was not a violent person "opened the door" to the question of whether she reacted to violence with violence, and permitted the Defense to introduce "extrinsic evidence" of "violent reactions to establish that the lack of physical violence toward Appellant during their sexual encounter tended to show it was consensual."

We find the military judge did not abuse his discretion. As an initial matter, the military judge's ruling was not a question of "extrinsic evidence;" rather, it was a limitation on the scope of Appellant's opportunity to confront CO through cross-examination. *See Ellerbrock*, 70 M.J. at 318. Therefore, the parties' citations to *Langhorne*, 77 M.J. at 555–56, and *United States v. Mote*, No. ACM 39462, 2019 CCA LEXIS 372, at *39–43 (A.F. Ct. Crim. App. 13 Sep. 2019) (unpub. op.), *rev. denied*, 2020 CAAF LEXIS 10 (C.A.A.F. 2020)—cases in which extrinsic impeachment evidence was at issue—are not apt.

The military judge permitted the Defense to challenge CO's suggestion that she did not violently resist Appellant because she was not a violent person by nature with questions establishing that she had, in fact, had "very violent outbursts" in the past. The military judge further permitted the Defense to elicit

that CO had reacted violently in situations where she felt threatened and to quantify an estimate of the maximum number of times such outbursts had occurred. He properly concluded that such information was relevant and material, and its probative value was not substantially outweighed by the danger of countervailing concerns. *See* Mil. R. Evid. 401, 402, 403. These questions permitted Appellant to challenge and counteract CO's testimony regarding her opinion of her own character, without devolving into the specifics of extraneous situations or lurid details of unrelated violent incidents.

In contrast, questions about resulting injuries would have substantially increased the risks of distraction to the court members. Moreover, such evidence had already been robbed of its materiality by the permitted testimony that CO had, in fact, reacted violently in the past in situations in which she felt threatened. To the extent such testimony would have been relevant to undermine CO's opinion regarding her non-violence, that purpose had already been achieved by CO's responses to the permitted cross-examination, and therefore it would have been substantially cumulative and a waste of time as well.

Although it was not a model of clarity, the military judge articulated his Mil. R. Evid. 403 balancing on the record, and therefore we afford his ruling greater deference. For the foregoing reasons, we find he did not clearly abuse his discretion.

**F. Discovery**

### 1. Additional Background

Before trial, the Defense moved to compel production of several types of evidence related to CO, including: (1) CO's school records; (2) CO's medical records; (3) CO's mental health records; and (4) records related to support CO and her family received by virtue of CO's status as an alleged victim of sexual assault. After conducting a hearing, at which the Defense refined its request in certain respects, the military judge granted the motion in part and denied it in part. The military judge granted the defense request with respect to CO's history of drug prescriptions for six months before and six months after the date of the sexual assault, and allowed the release of records generated by CO's life coach, TB, on or about 2 February 2016, the date CO disclosed the sexual assault to him. The military judge noted the defense request for other medical records was essentially mooted when at the hearing the Defense accepted the Government's representation that CO did not receive any follow-on medical care as a result of the assault. The military judge denied the defense motion with respect to CO's school records, additional prescription records, and mental health records other than those created by TB on or about 2 February 2016.

During sentencing proceedings, the Defense sought reconsideration of the military judge's ruling following the testimony of KD, CO's mother, with respect to additional mental health records created by TB. Senior defense counsel contended KD's testimony regarding how the sexual assault affected CO put in issue CO's condition prior to the offense. The military judge reconsidered his prior ruling and again denied the motion.

**2. Law**

We review a military judge's ruling on a production request for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (citations omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under [Article 46, UCMJ, 10 U.S.C. § 846] . . . as implemented by R.C.M. 701–703." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013). Article 46 and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the Constitution. *See id.* at 187; *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004). Each party is entitled to the production of evidence which is relevant and necessary. R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703(f)(1) Discussion). R.C.M. 703(f)(3) provides that "any defense request for the production of evidence . . . shall include a description of each item sufficient to show its relevance and necessity."

Mil. R. Evid. 513(a) provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to a psychotherapist, in a case arising under the [UCMJ], if such

communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

The privilege is subject to a number of specific exceptions. Mil. R. Evid. 513(d).

Before ordering the production or admission of a patient's records or communications under Mil. R. Evid. 513, the military judge must conduct a closed hearing at which the patient is provided a reasonable opportunity to attend and be heard. Mil. R. Evid. 513(e)(2). Prior to conducting an in camera review of Mil. R. Evid. 513 evidence, "the military judge must find by a preponderance of the evidence that the moving party showed," *inter alia*, "a specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege." Mil. R. Evid. 513(e)(3)(A).

### 3. Analysis

On appeal, Appellant challenges the military judge's denial of the Defense's motion with respect to several types of records. We address each in turn.

#### a. School Records

The military judge denied the defense request for CO's school records from the seventh grade on as "wholly unsupported" and insufficient to demonstrate their relevance and necessity as required by R.C.M. 703(f)(3). He explained in his written ruling:

> Apart from a general reference to the potential for these materials to develop evidence useful for the reasons outlined by the defense [to indicate CO's disciplinary problems, academic performance, bullying, or school-related injuries], there has been no demonstration that these materials are relevant in total or not cumulative with other information already discovered where there may be some slight relevance. Moreover, there is no indication that the information regarding bullying or disciplinary actions—if it exists in some record available through compulsory process—would contribute to the defense's presentation of its case in some positive way.

On appeal, Appellant contends the military judge should have compelled discovery of CO's school records to enable the Defense to "test the veracity" of CO's and KD's claims that CO changed schools repeatedly due to being bullied, rather than due to CO's disciplinary problems. Appellant argues CO "opened the door" to such evidence during her testimony on cross-examination that she was "not a violent person by nature."

We find the military judge properly concluded the Defense did not meet its burden to demonstrate the relevance and necessity of these records. *See Rodriguez*, 60 M.J. at 246 (burden of persuasion on motion to compel discovery is on moving party) (citing R.C.M. 905(c)(2)(A), 906(b)(7)). The Defense made no showing as to what information these records would contain; rather, it speculated that the records might contain information helpful to the Defense. Moreover, CO's school records were entirely collateral to the charged sexual assault. Furthermore, the Defense did not request reconsideration of its production motion after it elicited, on cross-examination, CO's testimony that she was not a violent person. We find no abuse of discretion by the military judge.

### b. Transition to Independence Program (TIP) Records

At the time of the sexual assault, CO was being schooled from home with support from the Placer County Transition to Independence Program (TIP). TIP augmented her education with counseling on various subjects, including her "life coach" sessions with TB. On appeal, Appellant contends the military judge erred by failing to compel production of TIP records, beyond those created by TB on or about the date CO reported the offense. Appellant avers there might have been evidence of a "violent outburst" by CO during a TIP-sponsored event.

Similar to his resolution of the defense request to produce school records, the military judge denied this request for failure to demonstrate relevance and necessity in accordance with R.C.M. 703(f)(3). We also reach a similar conclusion. The military judge applied the correct law, and his conclusion was not "clearly erroneous." *See McElhaney*, 54 M.J. at 130 (citation omitted).

### c. Records Generated by TB

Appellant contends the military judge abused his discretion by failing to order production of records generated by TB—beyond those created on or about 2 February 2016—because he erroneously applied Mil. R. Evid. 513 to such records, despite the fact that TB was not a mental health counselor for TB. He contends TB was acting as a "life coach" to TB rather than a therapist, and cites CO's and KD's beliefs that TB was not functioning as a CO's mental health counselor. We find Appellant's argument unpersuasive, for two reasons.

First, in the military judge's findings of fact in his written ruling on the motion to compel, which we do not find to be clearly erroneous, he found TB was a "professional clinical counselor intern," licensed by the State of California as such, with degrees in psychology and mental health counseling, who provided services for TIP under the direction of a licensed clinical social worker. His responsibilities in working with CO for TIP included "assessing and diagnosing minors for mental disorders, case management, developing

treatment plans, facilitating workshops and therapy groups as well as providing collateral and rehabilitative counseling for his clients in meeting treatment goals." The psychotherapist-patient privilege applies to "a confidential communication made between the patient and a psychotherapist or an assistant to the psychotherapist . . . if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition." Mil. R. Evid. 513(a). For purposes of Mil. R. Evid. 513, a "psychotherapist" includes, *inter alia*, a "clinical social worker" or "other mental health professional" who is licensed by a state; an "assistant to a psychotherapist" includes "a person directed by or assigned to assist a psychotherapist in providing professional services." Mil. R. Evid. 513(b)(2), (3). Given the facts found by the military judge, his conclusion that Mil. R. Evid. 513 would apply to professional communications between CO and TB was not clearly erroneous. *See McElhaney*, 54 M.J. at 130 (citation omitted). Use of the term "life coach" in connection with TB's counseling of CO did not vitiate the substance of his role as a licensed mental health professional supporting CO's mental and emotional well-being.

Second, even if we assume for purposes of argument that Mil. R. Evid. 513 did not apply to TB's communications with CO, the military judge reasonably found the Defense's motion failed on an even more fundamental level to establish relevance and necessity for records as required by R.C.M. 703(f)(3)—beyond the records related to CO's report that Appellant had sexually assaulted her, which were produced. As in the other cases, Appellant essentially speculates that the requested records might have contained some noncumulative information that may have contributed to the Defense's case in some way. Accordingly, the military judge did not abuse his discretion in denying production of records unrelated to the sexual assault report.

### d. Emergency Room Records

Appellant contends the military judge erred by failing to order production of hospital records regarding a purported emergency room visit by CO related to a mental health concern. The record of trial is ambiguous at best as to whether the Defense maintained such a request before or during trial. Regardless, as with the other record requests analyzed here, the Defense failed to demonstrate the relevance or necessity of such records as required by R.C.M. 703(f)(3). A good faith belief that CO may have been depressed at a particular point in the past, for reasons unrelated to Appellant and before the sexual assault took place, without more, is not a sufficient showing.

### e. "Stand Up Placer" Records

Appellant notes the Defense sought records from the "Stand Up Placer"[10] program reflecting benefits CO and her mother received based on CO's status as an alleged sexual assault victim. Appellant contends information regarding the number of counseling sessions CO received at "Stand Up Placer's" expense would not include confidential information, and would not fall under the Mil. R. Evid. 513 privilege. Regardless, the military judge noted the Government had agreed to provide certain "Stand Up Placer" material to the Defense, and he advised the parties he considered the request to compel these records "withdrawn unless additional information is submitted." The Defense did not raise the issue again at trial; accordingly, we find no error.[11]

### G. Prior Consistent Statements

#### 1. Additional Background

##### a. CO

During cross-examination, senior defense counsel questioned CO about the materials she had reviewed prior to her testimony, including CO's statement to the civilian police, her police interview, and notes taken by the first police officer to respond to the report of sexual assault. In addition, senior defense counsel elicited that CO received housing assistance, clothing, and unspecified "other services" based on her status as an alleged victim of sexual assault.

The Government subsequently called Det AC, the civilian police detective who investigated the sexual assault of CO. On redirect examination, trial counsel attempted to have Det AC testify to CO's statements to him during an interview on 12 February 2016. Trial defense counsel objected to hearsay; trial counsel explained that Det AC would testify to a prior consistent statement by CO. The military judge instructed trial counsel:

> I'm going to ask you to be fairly leading on this then, not in giving him the response, but in targeting that particular statement you're trying to adduce that is consistent with the testimony that was given by [CO] yesterday. So ask a fair bit of orienting questions before you call for the response so that I can confirm that would fall under [Mil. R. Evid.] 801(d)(1)([B]).

---

[10] CO resided in Placer County, California.

[11] Trial defense counsel's failure to reassert its motion to compel the "Stand Up Placer" records forms part of the basis for Appellant's assertion, pursuant to *Grostefon*, 12 M.J. at 431, that he received ineffective assistance of counsel, which we found to be without merit.

The military judge then sustained the hearsay objection "at this point."

Trial counsel then asked approximately 40 short, mostly leading questions which Det AC answered with brief, affirmative replies. Trial counsel thereby elicited numerous statements CO made to Det AC regarding the events surrounding the sexual assault. Trial defense counsel maintained an objection only once during this litany,[12] on the basis of hearsay, which the military judge sustained.

### b. KE

On cross-examination, senior defense counsel questioned KE about her decision to change her report that Appellant had sexually assaulted her from a restricted report to an unrestricted report. Senior defense counsel elicited that KE made this decision after her victim advocate called her for a meeting in September 2017 and informed her that other alleged victims had reported sexual assaults by Appellant. Senior defense counsel also suggested that the victim advocate "encouraged" KE to make an unrestricted report; KE denied that, and said it was KE's own choice to do so, although she acknowledged the victim advocate had "stated on the phone that she was going to see if [KE] would like to go unrestricted."

The Government subsequently called AE, KE's mother, to testify. AE testified that she received a "notable" phone call from KE in June 2017. Assistant trial counsel then asked AE, "What did [KE] tell you over this phone call?" Senior defense counsel objected to hearsay. In response, assistant trial counsel cited Mil. R. Evid. 801(d)(1)(B). The military judge overruled the objection "insofar as it falls under [Mil. R. Evid.] 801(d)(1)([B])." The military judge continued, a "narrative is probably unlikely to all fall within [Mil. R. Evid.] 801(d)(1)([B]) so I'd ask you to target your questions a little bit more . . . . [B]reak it up a little bit more than asking for a narrative. That's the condition of me overruling defense's objection."

Without further defense objection, AE then provided the following narrative account of what KE told her about the sexual assault:

> [KE] said that she had been raped by another Airman and that they were hanging out in her room. She said that she had told him she did not want to have sex that night. They were cool to hang out and everything. He attempted to get intimate, she had told him no. He waited until she fell asleep and she woke up feeling him push inside of her. She said that she had asked him what he was doing. He asked her if she wanted him to stop and

---

[12] Trial defense counsel made and then withdrew two other objections, one on the basis of hearsay and one on the basis of speculation.

she said yes. She said she did or he did stop. She fell back asleep. In the morning he was still there, she told him to leave and he had asked her to please not report it because he was only 22.

Senior defense counsel did object to hearsay again when AE continued to describe what KE had said Appellant said about why he did not want KE to report the incident. Assistant trial counsel cited Mil. R. Evid. 803(3). At that point the military judge held an Article 39(a), UCMJ, hearing without the members to explore the proposed testimony. During the hearing, the military judge asked assistant trial counsel for clarification, under Mil. R. Evid. 801(d)(1)(B), as to what "express or implied improper influence or motive to fabricate" the Government sought to rebut with AE's testimony about the phone call. Assistant trial counsel cited KE's September 2017 meeting with the victim advocate, and argued the Defense implied the victim advocate convinced KE that she was a victim. The military judge found the June 2017 phone conversation did constitute a prior consistent statement and overruled the Defense's hearsay objection.

### c. Instruction

The military judge included the following in his instructions to the court members on findings:

> You have heard evidence that [CO and KE] made statements prior to trial that may be consistent with their testimony at this trial. If you believe that such consistent statements were made, you may consider them for their tendency, if any, to rebut an express or implied charge that the witness recently fabricated the statement, acted from a recent improper influence or motive in so testifying, and to rehabilitate their credibility as a witness. You may also consider the prior consistent statements as evidence of the truth of the matters expressed therein.

### 2. Law

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citing *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)) (additional citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013) (citation omitted). The failure to make a timely objection to evidence at trial forfeits that error in the absence of plain error. Mil. R. Evid. 103(a)(1)(A); *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted). To prevail under a plain error analysis, an

appellant must show: "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted).

Hearsay is generally inadmissible unless an exception applies. Mil. R. Evid. 802. However, Mil. R. Evid. 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

The CAAF has identified three criteria for out-of-court statements to be admissible as a non-hearsay prior consistent statement under Mil. R. Evid. 801(d)(1)(B)(i): "(1) the declarant of the statement must testify and must be subject to cross-examination about the prior statement; (2) the statement must be consistent with the declarant's testimony; and (3) the statement must be offered 'to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in testifying.'" *Frost*, 79 M.J. at 109–10 (quoting [Mil. R. Evid.] 801(d)(1)(B)(i)). In addition, "the prior statement . . . must precede any motive to fabricate or improper influence that it is offered to rebut," and "where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Id.* at 110 (citations omitted).

### 3. Analysis

#### a. CO

Appellant argues CO's statements to Det AC on 12 February 2016 do not qualify as prior consistent statements under Mil. R. Evid. 801(d)(1)(B). He contends the statement did not precede the improper influences or motivations that caused her to report the sexual assault on 2 February 2016. He further contends her statements to Det AC were not consistent with her trial testimony in certain respects. In addition, he notes the military judge did not conduct an analysis on the record of whether Det AC's testimony qualified as a prior consistent statement, and therefore this court should afford the decision to permit the testimony less deference.

We do not find these arguments persuasive. First, to qualify as non-hearsay under Mil. R. Evid. 801(d)(1)(B)(i), a prior consistent statement need not precede *every* alleged improper motive or influence on the witness's trial testimony. So long as it precedes one of several alleged improper motives or influences, it is admissible to rebut that allegation. *Frost*, 79 M.J. at 110 (citations

omitted). Because such a statement is not hearsay, once admissible under Mil. R. Evid. 801(d)(1)(B), it may also be considered on any matter for which it may be relevant. Senior defense counsel's cross-examination of CO suggested that at least two improper influences after the 12 February 2016 interview that might have affected CO's trial testimony: that CO had reviewed materials from the investigators' files to prepare for her testimony, including police notes; and that CO and her family had received benefits based on her status as an alleged victim of sexual assault.

Second, Det AC's testimony regarding CO's statements on 16 February 2016 was "generally consistent" with CO's testimony in court, and Appellant has not identified any materially inconsistent aspects. *See Finch*, 79 M.J. at 398. Appellant cites Det AC's testimony that CO told him she "already had a boyfriend" as inconsistent with other statements attributed to CO that she had broken up with her boyfriend; however, CO did not *testify* that she had broken up with a boyfriend at the time of the sexual assault. Similarly, Appellant's contention that CO's statement to Det AC that she told Appellant to stop *before* he penetrated her is inconsistent with the testimony of a different civilian police officer that CO told Appellant to stop *after* he penetrated her is inapt, because the relevant issue is consistency with CO's own testimony at trial.

Moreover, Appellant's position on appeal suffers from a more fundamental weakness. At trial, the Defense did not object to the vast majority of the testimony that he now challenges on appeal. On the two occasions senior defense counsel maintained hearsay objections, the military judge sustained the objections. Because the Defense forfeited its objections to the other questions, we review for plain error—that is, error that should have been "plain" or "obvious" to the military judge. *Erickson*, 65 M.J. at 223 (citations omitted). The military judge is not required to make strategic or tactical decisions on behalf of a party, who may elect not to challenge arguably excludable hearsay testimony for various reasons. In this case, the military judge may have perceived multiple potential reasons why the Defense elected not to object to the majority of Det AC's testimony. For example, the Defense may have perceived the testimony was in fact admissible under Mil. R. Evid. 801(d)(1)(B), provided trial counsel articulated an appropriate rationale; the Defense may have intended to make use of perceived inconsistencies between what CO told Det AC and other evidence introduced at trial, as Appellant has attempted to do on appeal; or the Defense may have desired not to appear obstructionistic or as if they had something to fear from Det AC's testimony by objecting in front of the court members. There may be times when a military judge has an obligation to intercede *sua sponte* in order to protect an accused's substantial rights and ensure a fair proceeding. *See United States v. Cox*, 42 M.J. 647, 652 (A.F. Ct. Crim. App. 1995), *aff'd*, 45 M.J. 153 (C.A.A.F. 1996) (citing *United States v. Toro*, 37 M.J. 313, 316 (C.M.A. 1993)) ("If there is a defense strategy to allow the evidence, and admission does

not affect a substantial right of the appellant, then there is no plain error."). However, this was not such a case, and we find the military judge did not plainly err by declining to intervene in Det AC's testimony *sua sponte*.

### b. KE

The military judge overruled the Defense's initial hearsay objection to AE's testimony regarding the June 2017 phone call from KE. Although the Defense did not object when, contrary to the military judge's instructions, AE provided a narrative description of the content of the call, we will assume for purposes of argument that the Defense's initial objection that was overruled was sufficient to preserve the objection on appeal. Accordingly, we review the ruling for an abuse of discretion, and we find none.

Applying the criteria set forth in *Frost*, 79 M.J. at 110 (citation omitted), we note KE testified and was subject to cross-examination regarding this prior statement. Furthermore, we find the statement was offered to rebut the express or implied charge that KE's testimony was influenced by the information about Appellant that she learned from the victim advocate approximately three months later, in September 2017. Appellant's contention that the military judge erred rests on his assertion that KE's statements to AE were actually inconsistent with her trial testimony in several respects. However, the discrepancies Appellant identifies are minor and do not affect the general consistency of the prior statement. *See Finch*, 79 M.J. at 398. Whether KE told Appellant to leave her room immediately after the assault or in the morning when he was still there, and whether KE told her mother that she woke up when Appellant penetrated her or a moment earlier when he pulled down her clothing, are details that do not vitiate the substantial consistency of the statement as a whole.

### c. Instruction

Because the military judge properly admitted prior consistent statements pursuant to Mil. R. Evid. 801(d)(1)(B), his instruction to the court members as to how to use that information was appropriate. Appellant argues the military judge erred by failing to specify the portions of the prior statements that were actually inconsistent, and therefore were not admissible at substantive evidence. We are not persuaded.

"[A] military judge has wide discretion in choosing the instructions to give," so long as he provides an "accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). Here, the military judge provided an accurate, complete, and intelligible instruction. He did not prescribe any conclusion that a particular statement was or was not consistent with the witnesses' testimony, but appropriately left it to the members to draw their own conclusions. We find no error.

**H. Findings Instructions**

**1. Additional Background**

The Defense objected to the inclusion of the instruction, "A person cannot consent while under threat or fear" within the definition of "consent" in relation to the elements of the charged Article 120, UCMJ, offenses. Trial defense counsel argued that "the evidence didn't raise the concern of a threat or fear in any of the four specifications [under Article 120, UCMJ]," and in conjunction with expert testimony the Government introduced regarding "tonic immobility," the instruction had "the potential to confuse or mislead the members."

Relevant to this appeal, the military judge overruled the objection with regard to Specification 2 (involving CO) and Specification 3 (involving KE). He found the issue of threat or fear was raised by the evidence on these specifications. Additionally, he explained: "[T]his instruction is . . . making it clear to the finder of fact that a freely given agreement cannot be the product of threat or fear. It's another way of stating what is clearly unobjectionable, in the sense that it comes from the statutory language, as well as the Manual."

Accordingly, the military judge provided the following instructions with respect to the elements of Specifications 2 and 3, alleging sexual assault by bodily harm without consent on CO and KE:

> "Consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. *Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent.* A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent. *A person cannot consent while under threat or fear.* Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent*, or whether a person did not resist or ceased to resist only because of another person's actions*.

(Emphasis added.)

**2. Law**

Whether the military judge correctly instructed the court members is a question of law we review de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citation omitted).

"[A] military judge has wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law." *Behenna*, 71 M.J. at 232 (citations omitted). "[T]he military judge . . . is required to tailor the instructions to the particular facts and issues in a case." *United States v. Baker*, 57 M.J. 330, 333 (C.A.A.F. 2002) (citations omitted).

**3. Analysis**

Echoing his jurisdictional argument we addressed above, Appellant argues that because the Government chose to prosecute him for sexually assaulting CO and KE only on a theory of bodily harm, the military judge was "required to remove all references" to other potential theories of culpability, including "lack of resistance, use of force, threat of force, and fear." Therefore, Appellant asserts, the military judge erred by including the italicized portions of the instruction quoted above, referencing resistance, submission, threats, and fear. We disagree.[13]

In order to convict Appellant of sexual assault against CO and KE, the Government was required to prove, *inter alia*, that Appellant penetrated their vulvas with his penis without consent. *See MCM*, pt. IV, ¶ 45.b.(3)(b). Therefore, consent was obviously at issue. The language of the instruction the military judge provided is taken directly from the statutory definition of "consent." *See* 10 U.S.C. § 920(g)(8). No doubt, a military judge should tailor instructions to the evidence in a particular case, but that is what the military judge did. He provided instructions regarding threats and fear because the evidence raised the possibility that Appellant's conduct made the alleged victims feel threatened or afraid.

"All the surrounding circumstances are to be considered in determining whether a person gave consent . . . ." 10 U.S.C. § 920(g)(8)(C). Those circumstances may include whether the alleged victim was threatened or afraid, as well as whether she was asleep or unconscious at the time of the alleged assault, or other factors. The fact that such evidence might also have supported other, uncharged theories of sexual assault does not make an instruction inappropriate where such evidence is also relevant to the charged theory of absence

---

[13] We note the record indicates trial defense counsel objected only to the words, "A person cannot consent while under threat or fear." Trial defense counsel's subsequent statement that the Defense did not object to the other instructions of which Appellant now complains waives the objection on appeal. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (trial defense counsel's affirmative declination to object to instructions or offer additional instructions waives objection on appeal). Recognizing our authority to pierce waiver in order to correct a legal error, we do not distinguish between the various portions of the instruction in our analysis. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018) (citations omitted).

of consent. Ultimately, we can be certain the court members convicted Appellant of Specifications 2 and 3 of Charge I on the charged theory of bodily harm by lack of consent because those were the elements on which the military judge instructed them. *See Taylor*, 53 M.J. at 198 (citations omitted) (court members are presumed to follow instructions absent evidence to the contrary).

## I. Prosecutorial Misconduct

### 1. Additional Background

Senior defense counsel cross-examined CO about a telephonic interview the Defense conducted with her in June 2017. One of the assistant trial counsel, Captain (Capt) WC, listened to the interview by telephone. Senior defense counsel asked CO whether Capt WC had interrupted the interview multiple times and advised CO not to answer certain questions. This drew an objection from the Government, and senior defense counsel asked to be heard in an Article 39(a), UCMJ, hearing outside the presence of the court members.

During the hearing, senior defense counsel began to explain: "I think it is probative that their -- her willingness to cooperate with defense, her willingness to cooperate with prosecutors and insofar as prosecutors encouraged her not to speak with us, I am not . . . ." At that point, the military judge interrupted and expressed considerable concern that the Defense appeared to be raising the issue of prosecutorial misconduct and discovery violations. The military judge asked senior defense counsel: "Are you asking for any relief in terms of your pretrial discovery or do you have any complaint of prosecutorial misconduct?" Senior defense counsel responded, "No sir." Over the course of the lengthy hearing, the military judge clarified with senior defense counsel that the purpose of this line of questioning was essentially to suggest CO was biased in favor of the Government, not to allege government misconduct. With respect to discovery, senior defense counsel told the military judge that the Defense had "a lot of opportunity" to talk to CO across various hearing and interviews, that "access" had been "good," and the Defense "got what [it] needed." He reiterated that the Defense was "not alleging any sort of ethical, prosecutorial misconduct at all."

Ultimately, the military judge sustained the Government's objection in part. When the court members returned, the military judge instructed them to disregard any reference to "interruptions by a trial counsel or any recommendation as to how [CO] might answer a question or not answer a question." When the cross-examination resumed, CO testified she had spoken to the prosecutors more often than to the Defense, and that she had refused to answer multiple questions from defense counsel and at least one question from the prosecutors. Senior defense counsel did not revisit Capt WC's role in the June 2017 interview.

### 2. Law

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual [for Courts-Martial] rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)) (quotation marks omitted). Where the defense properly objects at trial, we review alleged prosecutorial misconduct for prejudicial error. *Id.* at 159 (citation omitted).

Whether an appellant has waived an issue is a question of law we review de novo. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citing *United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019)). Waiver is the intentional relinquishment of a known right. *Id.* (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)) (additional citations omitted). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011)) (internal quotation marks and additional citation omitted).

### 3. Analysis

Appellant now asserts on appeal that Capt WC unlawfully interfered with the Defense's access to CO. *See generally Stellato*, 74 M.J. at 481–84 (Government must allow defense equal access to witnesses and evidence and may not unreasonably impede access) (quoting 10 U.S.C. § 846; R.C.M. 701(e)). He further asserts the military judge failed to provide an adequate remedy for this violation, and also erred by instructing the court members to disregard references to Capt WC's interruption.

However, in response to an extended and very specific inquiry by the military judge, senior defense counsel repeatedly disavowed any claim of prosecutorial misconduct or discovery violation with respect to the June 2017 interview. We find the Defense thereby affirmatively relinquished the right to seek a remedy for any alleged impropriety on Capt WC's part, and thereby waived appellate review of the matter. *See Davis*, 79 M.J. at 331 (citation omitted).

In general, a valid waiver leaves no error to correct on appeal. *Id.* (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). We recognize our authority pursuant to Article 66, UCMJ, 10 U.S.C. § 866, to pierce waiver in order to correct a legal error in the proceedings. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2017). We decline to do so in this case. In the approximately ten months between the June 2017 interview and senior defense counsel's cross-examination of CO, the Defense never sought any remedy for the

misconduct Appellant now asserts or any resulting prejudice to his discovery rights. Senior defense counsel told the military judge, in essence, that the Defense's access to CO had not been materially impaired. Moreover, the Defense's affirmative waiver of the issue denied the military judge the opportunity to fully examine and adjudicate the matter, leaving this court with a very incomplete record on appeal. Accordingly, we find this issue warrants no relief.

## J. Sentencing Evidence

### 1. Additional Background

The Government called KE's mother, AE, to testify during sentencing proceedings. AE described KE generally, and then described how AE felt about KE joining the Air Force. When senior trial counsel asked how AE felt "about the fact that [KE] was assaulted by somebody who's also in the military," AE responded: "It angers me because not that I didn't think anything like this ever happen[s] because you hear about sexual assault everywhere, you hear about it --" At that point, senior defense counsel objected to "[i]mproper sentencing evidence." The military judge asked senior defense counsel, "You don't believe that this falls under [R.C.M.] 1001(b)(4)?" Senior defense counsel replied, "No sir." The military judge overruled the objection. AE went on to testify that, *inter alia*, she was surprised the assault occurred on base; the fact that KE was not the only victim "made it even worse" for AE; AE was distressed that she could not be where KE was to support her; and the incident made AE more protective and "overbearing" with her two younger daughters. The Defense did not object again during AE's testimony.

The Government also called CO's mother, KD, to testify during sentencing. KD testified, *inter alia*, that she personally felt "angry," "disgusted," and "devastated" by the sexual assault of CO. KD testified it was "torturous to know it happened when [KD] was there" in the apartment, that KD "felt like [she] didn't protect" CO, and that the incident would have a "huge" impact on KD as a mother. Trial defense counsel did not object during KD's testimony.

### 2. Law

We review a military judge's decision to admit sentencing evidence for an abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009) (citing *Manns*, 54 M.J. at 166). However, "[w]hen an appellant does not raise an objection to the admission of evidence at trial, we first must determine whether the appellant waived or forfeited the objection." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted). "[F]ailure to make the timely assertion of a right" constitutes forfeiture. *Ahern*, 76 M.J. at 197 (citations omitted). We review forfeited issues for plain error. *Id.* To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) it

was plain or obvious; and (3) the error materially prejudiced a substantial right." *Erickson*, 65 M.J. at 223 (citations omitted).

R.C.M. 1001(b)(4) permits the Government to introduce evidence in aggravation during sentencing proceedings. The rule provides, in pertinent part:

> The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused
>
> . . . .

### 3. Analysis

Appellant contends the military judge abused his discretion by permitting AE and KD to testify regarding the emotional impact of the offenses on themselves as the mothers of the victims pursuant to R.C.M. 1001(b)(4). He notes R.C.M. 1001A(b)(1)—a different rule—defines a "crime victim," "[f]or purposes of th[at] rule," as "an individual who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." He then reasons that AE and KD did not suffer *direct* harm from the offenses, and "therefore could not be permitted to testify about the impact of Appellant's crimes on them under R.C.M. 1001(b)(4)." We disagree.

As an initial matter, the Defense objected only once during the testimony Appellant now challenges. It appears the testimony the Defense found objectionable was not the emotional impact on AE or KD, but AE's reference to what she had "heard" about sexual assault. Accordingly, Appellant forfeited the objections he now asserts. We find no error on the military judge's part, much less "plain or obvious" error. *Erickson*, 65 M.J. at 223.

A witness is not required to meet the R.C.M. 1001A(b)(1) definition of a "victim" in order to testify to aggravating circumstances under R.C.M. 1001(b)(4). Appellant overlooks the relevant portion of the R.C.M. 1001(b)(4). The criteria is aggravating circumstances "directly relating to or resulting from the offenses" of which Appellant was convicted. R.C.M. 1001(b)(4). Appellant correctly observes "an accused is not responsible for a never-ending chain of causes and effects." *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) (citation and internal quotation marks omitted). However, "evidence of the natural and probable consequences of the offenses of which an accused has been found guilty is ordinarily admissible at trial." *United States v. Stapp*, 60 M.J. 795, 800 (A. Ct. Crim. App. 2004) (citing *Rust*, 41 M.J. at 478), *aff'd*, 64 M.J. 179 (C.A.A.F. 2006). The emotional distress AE and KD felt was a natural and

probable consequence of Appellant's offenses and directly related to those offenses. Appellant cites no decision of our superior court, this court, or our sister courts holding that the parent of a sexual assault victim who learns of the crime within days of the offense cannot testify regarding their resulting emotional distress, and we are aware of none. Accordingly, we conclude the military judge did not abuse his discretion by overruling the Defense's sole objection at trial or declining to interrupt the testimony *sua sponte*.

## K. Expert Testimony Regarding "Tonic Immobility"

### 1. Additional Background

The Government called Dr. JT to testify during the findings portion of Appellant's trial as an expert in clinical and forensic psychology. After conducting a *Daubert* hearing outside the presence of the court members, over the Defense's objection the military judge permitted Dr. JT to testify regarding the concept of "tonic immobility" in sexual assault victims. *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Before the members, Dr. JT testified, *inter alia*:

> During a sexual assault a lot of times we see three different variables come into play. And the first one maybe that they -- should they are [sic] will they fight back? Will they flight or run away or will they freeze? This reaction has been found throughout the literature fairly commonly. Each victim is going to determine based usually on their background and characteristics, as well as the situation, which one of those responses they make. So there is an internal assessment that is going on that is fairly autonomic. There's not a lot of cognition that goes into it. It's basically an arousal response within the nervous system that tells us either to fight back, to flee the person that is doing this, or to freeze up.

Dr. JT further explained that the "involuntary" freeze response manifested to different degrees across different individuals and situations. Thus some sexual assault victims might become "completely paralyzed, unable to vocalize or to move," whereas other victims may be able to move or speak to some extent. The duration of the reaction was also variable. Dr. JT further testified it was "not unusual" for sexual assault victims to not fight back or cry out, and it was "very common" for victims to "freeze" or "feel paralyzed."

On cross-examination, Dr. JT agreed that "pretty much" anything could be a response to sexual assault. In addition, trial defense counsel explored some of the limitations on the research underlying Dr. JT's testimony.

### 2. Law

A military judge's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Ellis*, 68 M.J. at 344 (citation omitted).

Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The CAAF has articulated six factors to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Although *Houser* predates the leading Supreme Court decisions in this area, *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Billings*, 61 M.J. at 166 (citations omitted). "[W]hile satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). The military judge's inquiry is "flexible" and "tied to the facts of [the] particular case." *Id.* (citations omitted).

### 3. Analysis

On appeal, Appellant does not challenge Dr. JT's qualifications to testify as an expert witness or the scientific basis for her testimony. Instead, he contends Dr. JT's testimony was "not relevant" to either CO or KE, because neither victim experienced fear or a threat with regard to Appellant. In Appellant's view, CO's testimony that she "zoned out" during the assault, KE's statements that she was as asleep when Appellant penetrated her, and the military judge's finding that CO and KE felt confused during the assaults were insufficient to make Dr. JT's testimony regarding fear responses relevant.

We disagree. The military judge reasonably determined Dr. JT's testimony would be helpful to the court members to understand the victims' responses that the Defense challenged on cross-examination as being counterintuitive. *See United States v. Flesher*, 73 M.J. 303, 313 (C.A.A.F. 2014) (citations omitted) (expert testimony about counterintuitive behaviors of sexual assault victims is allowed because it assists jurors in overcoming widely-held misconceptions). Prior to Dr. JT's testimony, CO testified that after initially resisting, she "gave up" and lay still as Appellant continued the assault, she did not cry out, and she was "really confused" during the assault. KE testified that when Appellant pulled her clothing down and penetrated her, she felt "shocked," "paralyzed," and her body felt "frozen." The Defense cross-examined both victims specifically about their reactions during the assaults. To the extent the Defense sought to cast doubt on the victims' testimony by suggesting their reactions were illogical or not indicative of sexual assault, Dr. JT's testimony tended to counteract any preconceptions the members might have held.

The significance of Dr. JT's testimony was not that sexual assault victims react in specific ways. To the contrary, her testimony indicated sexual assault victims respond in different ways, to include not moving and not crying out in some cases, and therefore any fixed preconceptions the members might have as to how a sexual assault victim would or should behave may not be valid. Her testimony the Defense elicited on cross-examination that a sexual assault victim might respond in "pretty much" any way illustrates the point. Accordingly, we find no abuse of discretion.

**L. Post-Trial Delay**

Appellant's case was docketed with this court on 19 September 2018. Appellant's civilian appellate defense counsel filed their notice of appearance with this court in October 2018. Appellant filed his assignments of errors 491 days later on 23 January 2020, after his counsel requested and were granted 14 extensions of time in which to file his brief. The court conducted status conferences with counsel for both parties in June 2019, August 2019, and December 2019 to monitor the progress of Appellant's case. At the last status conference, held on 10 December 2019, Appellant's counsel affirmed that Appellant was aware of and agreed to the additional delay in his case. The Government consistently opposed Appellant's motions for enlargement of time.

The Government filed a timely answer brief on 24 February 2020. Appellant then moved for an extension of seven days in which to file his reply brief, which this court granted, again over the Government's opposition.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*,

63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citations omitted). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration nor impairment of the Defense at a rehearing because Appellant has not prevailed in his appeal. *See id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has articulated no such particularized anxiety in this case, and we discern none. To the contrary, Appellant's counsel affirmed that Appellant agreed with the delays in order to ensure his counsel prepared a thorough brief on his behalf.

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. We do not find such egregious delays here. The record of trial is unusually large and includes 17 volumes. The proceedings took place over 15 days, and the transcript spans 2,510 pages. Appellant has raised 16 separate issues for our consideration. Additionally, the appellate delay in this case is overwhelmingly attributable to the Defense. Despite the size of the record and number of issues, the Government filed a timely answer without requesting an extension. This court is issuing its opinion within three months of the *Moreno* date. Appellant has neither demanded speedy appellate review nor asserted that he is entitled to relief for appellate delay. Accordingly, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *Id.*

Recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court